FILED
JAMES J. WALDRON
FEB 0 7 2014
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

Phone: (973) 368-1244
Fax: (973) 645-3696

**MORRIS STERN**
BANKRUPTCY JUDGE

**NOT FOR PUBLICATION**

February 7, 2014

WASSERMAN, JURISTA & STOLZ, P.C.
Scott S. Rever, Esq.
225 Millburn Avenue, Ste. 207
P.O. Box 1029
Millburn, NJ 07041
*Attorneys for Plaintiff,*
*Robert B. Wasserman, Chapter 7 Trustee*

DUNN, BROWNE & VARCADIPANE, LLC
Timothy J. Dunn II, Esq.
Jeffrey W. Varcadipane, Esq.
645 Westwood Avenue, Ste. 200
River Vale, NJ 07675
*Attorneys for Defendants, Durie Properties, LLC,*
*CLM Management Corp., Louis A. Capazzi, Jr.*
*and Ann Capazzi*

CAPEHART & SCATCHARD, P.A.
William G. Wright, Esq.
8000 Midlantic Drive, Ste. 300 S
Mt. Laurel, NJ 08054
*Attorneys for Offices of Charles Shaw*
*& Associates and Charles Shaw, Esq.*

CHARLES SHAW & ASSOCIATES, P.C.
Charles Shaw, Esq.
Eilish McLoughlin, Esq.
170 Washington Avenue
Dumont, NJ 07628
*Attorneys for Charles Shaw, Esq.*
*and Virginia Day*

**LETTER OPINION**[1]
**ORIGINAL FILED WITH THE CLERK OF THE COURT**

Re:    In re Ralph M. Day, Sr., Case No. 08-18384 (MS)
       <u>Wasserman v. Durie Properties, LLC, et als, Adv. Pro. No. 13-1959</u>

Dear Counsel:

The trustee in this Chapter 7 case seeks a permanent injunction against certain adverse

parties initiating and/or continuing state court litigation which would by rule, statute, and a

proposed voluminous complaint, extend matters in dispute. That extension of litigation would

include (but not be limited to) frivolous litigation assertions against the trustee and related

parties. Those parties adverse to the trustee have moved this court for various forms of relief to

---

[1] Table of Contents annexed hereto.

permit the state court processes to go forward.

This bankruptcy case, currently under Chapter 7, was originally filed via a voluntary Chapter 11 petition on May 6, 2008. A Chapter 11 trustee, Robert Wasserman, was appointed on January 5, 2009; ultimately the case was converted to one under Chapter 7 (February 3, 2010), with Wasserman being the Chapter 7 trustee.

The period following the original filing (now approaching six years) has had extensive litigation activity, currently focusing on the Superior Court of New Jersey, Law Division, Bergen County case (Dkt. No. L-46004-09) (the "state case"), which was initiated *May 20, 2009* (ostensibly naming the debtor, Ralph Day, Sr., and his wife Virginia as plaintiffs, the debtor being replaced as a plaintiff by Robert Wasserman, then Chapter 11 trustee, in an amended complaint filed November 17, 2009).[2] The trustee's pleading has culminated by process of amendment (including the naming of additional defendants) in the "Third Amended Complaint," filed July 15, 2011.

By the time the dust settled in the affirmative pleading process, the trustee was asserting twenty-three counts emanating from real estate-based development projects co-ventured in one

---

[2] The captioning/filing of the original complaint was apparently intended to be on behalf of the trustee, special counsel Charles Shaw having just been appointed to represent the estate under the auspices of the trustee (May 8, 2009) (though Shaw had been appointed earlier, October 1, 2008, for the debtor-in-possession); in any event, the trustee ratified the earlier filing as to his position as a party-plaintiff (completely displacing the debtor *who substantively could not have had that status*), and in that sense cured any procedural defect which might impact negatively upon the estate in bankruptcy. Yet, as will be seen, a defense mindset has persisted which most often results in targeting the *debtor* whereas *the trustee on behalf of the estate* is actually the proper party-plaintiff. This, in and of itself, has led to substantial confusion over the years, continuing to this point today. Regarding Virginia Day, she was named as a captioned plaintiff solely to assure that a potentially "indispensable party" was not omitted; Virginia Day has agreed that she had no stake by way of any recovery in the outcome of the state case. To be clear, Ralph Day was *never* a party in the state case, and the court upon review of this entire matter so finds.

form or another by the debtor and defendant Louis A. Capazzi, Jr.  Their many business

ventures, seemingly gone sour, generated counts for RICO violations (Counts 1, 2, 3 and 4),

Misrepresentation (Count 5), Fraud (Count 6), False Premises (Count 7), Negligence (Counts 8

and 9), and Attorney Malpractice (Count 10), among other direct claims seeking recourse against

parties-defendant in addition to Capazzi.

   In addition to Capazzi, named defendants included: Capazzi's wife Ann (hereinafter

"Ann"), (who, notably, was/is an owner of East Coast Title Agency, though at one point Capazzi

was said to be the "principal"[3]); East Coast Title Agency (Ann's agent/broker entity which

served in that capacity for Chicago Title Insurance Company in certain relevant real estate

transactions); Chicago Title (a national title insurer which issued policies in relevant

transactions); William J. Rush, Esq. (real estate attorney who provided legal services in one or

more relevant transactions in dispute); Ankit Duggal (a notary public, said to be associated with

Rush and/or East Coast, who is alleged to have attested to certain documentation relevant to real

estate transactions in dispute); Paul Case (said to be associated with Capazzi, a notary public

alleged to have attested to certain documentation relevant to real estate transactions in dispute);

and, Durie Properties, LLC (a New Jersey limited liability company through which Day and

Capazzi operated, to one degree or another).

---

[3]On August 13, 2010 counsel wrote to Shaw's law office "[W]e represent East Coast . . . and *Louis A. Capazzi, as principal of East Coast*. . . ." [Emphasis added.]  Dkt. 14,  Ex. MM.

As will be seen, by virtue of three bankruptcy court approved settlements *directly*[4] affecting certain defendants in the state case (with Rush and Chicago, then East Coast and Case, and then Duggal), the matters in dispute in that case were at least theoretically narrowed.

The ultimate responsive pleading included, in addition to denials and defenses, eleven significant *counterclaim* counts.[5]  The counterclaiming defendants were only Capazzi, Durie, and CLM.  As pled, the trustee and Virginia Day (the ultimate named plaintiffs) were targeted.[6] Essentially, the same basic real estate ventures complained of by the trustee were, in one or another reverse view, complained of by the counterclaimants.  There are, however, at least two variants from the real estate-based claims: counterclaim Count 9 is for malicious prosecution based upon the trustee's (and Virginia Day's) initiation of the subject litigation; Count 11 is a claim asserting negligence of the trustee and seeks recourse only against him.

It is noteworthy that the counterclaimants: failed to seek bankruptcy court relief and

---

[4] Two other bankruptcy matters have impacted on claims in the state case.  By Notice of Settlement (June 6, 2011), the trustee resolved a dispute with the widow of a predecessor business associate of Day regarding real estate in Orangeburg, New York (335-39 Blaisdell Road); Day had claimed that Capazzi said their joint venture, Durie, would include that property.  The trustee's interest in the property was ultimately conveyed to the widow.  In addition, this court heard and decided (in a published opinion of February 2, 2011) on summary judgment an adversary proceeding initiated by the trustee against Capazzi and Ann as well as HSBC, to determine the validity of a mortgage lien said by HSBC to encumber yet another Durie-Capazzi-Day related property: 666 Closter Dock Road, Closter, New Jersey.  *Inter alia*, it was determined that HSBC's lien, thought to be based upon Ann's presumed record ownership, was void.  Ann, though a borrower from HSBC, was not a title holder.  Rather, the debtor was the named grantee on the recorded deed.  As a result, the estate succeeded to that interest "free and clear" of HSBC's claim.

[5] The counts of the Counterclaim are (1) fraud; (2) claim for wrongful taking and reimbursement; (3) breach of fiduciary obligation; (4) breach of duty of fair dealing; (5) breach of member's statutory obligation to contribute and share losses; (6) breach of venture agreement; (7) conversion of 335-39 Blaisdell Road, Orangeburg, Rockland County, New York; (8) constructive trust (with respect to the Blaisdell property); (9) malicious prosecution; (10) specific performance; and (11) trustee negligence.

[6] Debtor was cited in the preamble to the counterclaim but never formally pled against by way of third-party complaint or other valid and effective pleading or process.

authorization to sue the trustee; never sought relief to assert claims in the state case stayed by 11 U.S.C. § 362(a); chose not to file a proof of claim in this bankruptcy case; and, did not take steps to seek an exception to the discharge of Day's debts (which has now been granted). Moreover, now ingrained in the state court motions and proposed pleadings are (among other movant-pled deficiencies): allegations inconsistent with this court's approved settlements, appointments and determinations; assertions (particularly of "fraud" on this court) which should, if at all meritorious, have been raised with this court but were not; claims based on inapplicable legal concepts (e.g., that the trustee has been pursuing "derivative" actions for Durie rather than, as is his charge per 11 U.S.C. §§ 323, 704 and 1106, for the benefit of the 11 U.S.C. § 541(a) created estate in bankruptcy); and, causes with prepetition origins now subject to discharge (as well as the effect of extraordinary delay in properly moving against Day).

      <u>Bankruptcy Court Appointment Approvals (Trustee, Counsel and Special Counsel)</u>. Over the course of this bankruptcy case, trustee Wasserman was approved by this court for appointment twice, once as Chapter 11 trustee and then as Chapter 7 trustee. In each capacity, Wasserman's law firm was appointed to be his counsel. Of continuing significance is the series of appointments of Charles Shaw, Esq. (and/or his firm) as *special counsel*, first to the Chapter 11 debtor-in-possession (10/1/08 order), then in that capacity to the Chapter 11 trustee (5/18/09), and ultimately as special counsel to the Chapter 7 trustee (1/17/12). Shaw had filed the state case. *No objection was raised to Shaw's three previous appointments or his service over a period of more than four years*. However, by motions filed on 11/21/12 on behalf of a number of the state case defendants, Shaw's representation was attacked; disqualification was sought (and/or sanctions) for purported infractions in applying for special counsel status and otherwise

undertaking/promoting representation in the state case.[7] In the same period, Shaw's

representation was challenged by motion in the state case. Both bankruptcy court and state court

motions to disqualify Shaw were denied.

This court has noted that the East Coast-Case-Ann motion before this court argued (in

their supporting brief and among its many assertions) that: "The Claims in *Day v. Capazzi, et al.*

are Meritless and Were Contrived by Day and Shaw as Part of a Larger Scheme to Manipulate

the Bankruptcy Estate"[8] (p.22).    This ultimate point was not reached for determination (nor the

subject of direct focus at this time).  Rather, this court dealt with the *bona fides* of the state case

only in terms of the trustee's assessment of it and confidence in it.  Deference was given to that

assessment and Shaw's continued role in the litigation.  Compliance with state court rules by

Shaw, his status as a potential witness, conflict of interest and such issues were identified as

possible state court interests "if those issues were real."  In sum, this court said:

> Now, if Mr. Shaw's conduct ran afoul of one or another Court Rule in
> the Superior Court it was the obligation of the moving parties here to
> bring that to the attention of that judge.   They certainly moved on the
> basis of potential witness status of Mr. Shaw and lost on that motion
> [in the state case].   And they could have coupled that motion with
> substantive issues *if those issues were real* on the basis of conflict or
> otherwise.  And so they've taken another bite at the apple here.  The
> Court denies the motion for the reasons set forth on the record.

---

[7] Motions were filed by counterclaimants Capazzi-Durie-CLM and also, separately, by East
Coast-Case-Ann; the divide in representation eventually becomes somewhat confusing when Ann's
counsel (Mr. Varcadipane) joined the firm representing Capazzi et al.

[8] Most pertinent to the immediate matters before this court, this essentially unaddressed (on 12/17/12)
substantive argument was a theme of the defendants in the state case and would be regenerated for
extended litigation in the state court via frivolous pleading assertions (by rule and statute) and a
seventy-page "new" complaint that would rehash much of the tortured history of this dispute.

12/17/12 Tr. at 15:13-21 (emphasis added)[9].

Similarly, there was a state case hearing of December 5, 2012. The hearing transcript (related to Shaw being a witness in that case and as a precursor to the effort to disqualify him – ultimately denied), characterizes Shaw as an alleged party to purported Day misdeeds. The state judge was clear as to Shaw's potential party status. "He's not a party and he's not going to be a party. It's too late." (5:15-16). *See also id.* at 5:21-25. In essence, these belated two-court efforts to implicate Shaw in the state case – at least for disqualification purposes – were not given credence.

To reiterate, the first mention to this court that the state case was a contrivance of Day and Shaw, "Part of a Larger Scheme to Manipulate the Bankruptcy Estate," was a brief point in anticipation of the Shaw disqualification motion (heard 12/17/12). Yet this "scheming" is said to have dated back to *before* the filing of the state court complaint (5/20/09), and allegedly involved "manipulation" of the (unopposed) court-approval appointment process of Shaw on three occasions (10/1/08, 5/18/09 and 1/17/12).[10] It also postdated the court approval of the Rush-Chicago Title settlement of important claims in the state case (for $200,000, including $160,000 from Rush) on 8/24/12, unopposed by any of the state court defendants (and, as will be seen, perhaps the most telling rebuttal to the foundation of frivolous pleading allegations).[11] In

---

[9] The narrow point here as to state court interests was obviously not intended to be an invitation for defendants to litigate bankruptcy crucial issues (fraud on and manipulation of the bankruptcy estate) in a state court forum without authority and otherwise under the circumstances of this ongoing Chapter 7 case.

[10] *See* Varcadipane brief of 11/12/12 at pp. 36-40.

[11] *Now*, the movants – recognizing the significance of this settlement to their entire frivolous pleading claim – assert "on information and belief" the totally unsupported argument that the bankruptcy court was misled in this settlement process. *See* Dunn cert. ¶ 10 and proposed complaint ¶ 172. This court finds no

addition, two controversies involving real estate claimed by Durie has already been resolved (Blaisdell Road, settled by Order 6/7/11, and 666 Closter Dock Road by the 2011 summary judgment in a parallel adversary proceeding initiated by the trustee).  Movants' failure to bring this "large scheme" to "manipulate the bankruptcy estate" to the direct attention of the bankruptcy court in the years since its purported concocting (i.e., at least before 5/20/09) has: (i) undercut the credibility of those claims; (ii) wrongly placed matters of bankruptcy case administration before a forum not charged with overseeing bankruptcy cases; (iii) masked movants' intended or unintended roughshod ride over and "interpretation" of bankruptcy fundamentals (including the  § 363(a) stay, § 523 exception to discharge requirements, the claim allowance process, the historic *Barton* doctrine) as put before a state court which, while respected, was not the proper or experienced or readily *authorized* forum to resolve such matters; and (iv) buried "net" matters such as settlements, all in a *more recent* blizzard of voluminous docket entries in this court, accounts of state case and bankruptcy events, seemingly guided by notion that volume-measured submissions should prevail.  In the end, frivolous pleading claims based upon a manipulation of this court and bankruptcy estate were never brought to this court's attention in a meaningful way, were only mentioned late in the day, and were diverted to the wrong forum for resolution.  They are, after this court's in-depth review of its docket, *deemed abandoned* as late-raised, and *waived*; moreover, they are *without merit*, and provide *no foundation for any frivolous pleading* extension of otherwise never-ending aged state court litigation.

---

evidence of or reason to believe that it was misled.

Settlements with State Case Defendants.  Rush and Chicago Title settled the trustee's claims against them in the state case for $200,000 (allocated *$160,000* to Rush and the balance to Chicago Title).  The bankruptcy court approved the settlement (8/24/12 order).  No objection was made to this settlement or use of its proceeds as a fee to Shaw in consideration of his years of service in the litigation by parties to the state case.[12]  Significantly Rush, said by the Capazzi interests to have been wrongly threatened and abused by Shaw-Day prepetition, settled claims for legal malpractice along with numerous other grounds.

This settlement was "revisited" in the following colloquy at a hearing on a second settlement (that for $50,000 with East Coast and Case).

> MR. DUNN [for Capazzi, Durie and CLM]:  The reason I'm here is, a previous settlement with Attorney Rush, who was one of the defendants in this case, was approved by the Court, I believe, and it was for $200,000.  The entire amount was disposed of immediately, as we understand it.  It went to . . . Attorney Shaw to continue this litigation.

5/14/13 Tr. at 9:1-6.

> THE COURT:  All right.  Here – let's take a step back to the $200,000 to the big money that went as a fee to Mr. Shaw or his firm.

> MR. DUNN:  And we did not object to that, Judge.

> THE COURT:  (A) you didn't object to it, (b) it was the subject of a substantial hearing and all of it put on the record as to what justified that fee.  There was a further adjustment to the fee going forward, which was a contingent fee.  There were years of work in the case and nobody – I shouldn't say nobody – there was opposition, but not from you. . . .

---

[12] Ms. Mazzoccoli, who was involved in the 335-39 Blaisdell Road settlement on behalf of her husband's estate, objected to the use of these settlement proceeds for the Shaw fee; no issue was raised regarding any conflict or malfeasance of Shaw.  The objection was overruled.

*Id.* at 9:18-25, 10:1-2.

Next, East Coast and Case settled with the trustee for $50,000.[13] CLM, Durie and

Capazzi, though not *per se* objecting to the settlement, argued that the trustee's action was

"derivative" and thus for the benefit of the entity, Durie.  In addition, these defendants claimed

"costs."  This court approved the settlement (5/14/13 order), without awarding costs and

expressing its view (without rendering an ultimate decision) that the state case was by *no means*

*"derivative*."[14]  More specifically, claims per N.J.S.A. 42:2B-60 *et. seq.* (the then applicable

New Jersey Limited Liability Company Act) for security regarding fees were rejected, as were

defendants' claims as "judgment creditors" with rights per N.J.S.A. 42:2B-45. *See* Tr. 5/14/13,

4-7 (regarding, in particular, "costs" not including, e.g., deposition costs, fee shifting per N.J.R.

4:42-9, and two-party, nonderivative aspect of state case).

In any event, this settlement was entered into by the trustee with the understanding that

the *estate* would be the beneficiary.  No "derivative" action, defense or counterclaim was ever

pled in the state case by any defendant, or as indicated, as to the earlier $200,000 settlement.  Of

course, the trustee was never a member of Durie, nor sought to be such, nor became a member

by operation of law.  *See* in-depth review of applicable law in separate point hereinafter,

countering the recurring argument of movants regarding purported derivative claim rights.  Note

---

[13] At the time of the settlement, the state court had already issued an order for summary judgment (April 2, 2013) against the plaintiffs; no order regarding costs or fees was issued then, or at any time thereafter.

[14] *See* 5/14/13 Tr. at 6:8-13 ("Mr. Rever's client sues on behalf of the Day estate.  It appears as though Day's interest [in Durie] terminated when he filed, but in any event it's a two party case.  And, in that case, it is not a derivative action.  It's based on a fraud allegation against Mr. Capazzi and is not something that is subject to fee shifting under the statute, under any circumstances"); *id.* at 12:1-5 (No, I have no problem with . . . your raising the issues of derivative action or the rule.  I don't view it quite the same way as you do and probably the opposite, but that's a whole different point for another day.")

further that as part of the settlement whereby $50,000 was to be paid by East Coast (and Case),

East Coast Agency (a Capazzi enterprise, whether owned by Louis or Ann) "*agreed to waive any

and all claims relating to the issues in the complaint against the Trustee, the bankruptcy estate,

Ralph Day and Virginia Day.*" *See* Notice of Settlement, dkt. 331 (emphasis added). This waiver

of *purported* derivative-based claims is, under the circumstances of this and the state case, a

negative indicator for movants' position.

The third (and last) direct settlement was for $7,500, resolving trustee claims against

Duggal (Notice of Information of Settlement of 5/14/13). The settlement drew no objection or

claim of derivative benefits for Durie.

Blaisdell Road Settlement. By "Order Approving Multi-Party Settlement" (6/7/11), the

trustee settled matters in dispute in an adversary proceeding initiated by N. Mazzoccoli (as

Administratrix of the Estate of Andrew D'Alessio, her husband). Among the relatively complex

terms of the settlement (including terms pertaining to a third-party insurer), are the following:

> The Trustee will convey the Estate's one-half interest in and to the
> Orangeburg property to Mazzaccoli [sic] or the D'Alessio Estate for
> the sum of $25,000 free and clear of all liens, claims and
> encumbrances excluding only any outstanding real estate taxes and
> municipal assessments.

Notice of Settlement, dkt. 14. This settlement was broadly noticed, *not* the subject of any

objection (including any from defendants in the state case), and reviewed in a full hearing before

this court. *See* state court opinion of 6/4/13 at Point "T," p.32 (primarily for exposition of facts

conforming to the record in this bankruptcy court; but in the course of that exposition noting the

inherent weakness in defendants' claims against this property). This property and its disposition

through the bankruptcy court provide no foundation for any of the proposed future claims of the

movants.

    _Wasserman v. Capazzi_, 443 B.R. 338 (Bankr. N.J. 2011).  As referenced earlier, the state

case was also affected by litigation undertaken by the trustee.  The litigation related specifically

to 666 Closter Dock Road.  Using a "strong-arm" provision (11 U.S.C. § 544(a)(3)), this court

ruled against a bank's claim to equitable rights derived from an unrecorded mortgage obtained

from a would-be owner of the subject property.  The would-be owner, Ann, was the named

borrower in a substantial loan transaction with HSBC.  It is significant that Capazzi exposed in a

certification a reflection of his business practices (as well as those of Ann and perhaps Day), as

follows:

> 4.  The Debtor and I recognized an opportunity in the 666
> Closter Dock Road property (the "Property"), and, in furtherance of
> the venture, arranged for its purchase.
>
> 5.  The purchase of the Property was structured so that title
> was initially placed in the name of the Debtor, to hold for Durie, at
> Durie's expense and for Durie's sole benefit.
>
> 6.  When attempting to refinance the Property, because the
> Debtor did not have adequate credit, it was decided that title to the
> Property should be transferred from the Debtor to my wife, defendant
> Ann Capazzi ("Ann"), to which the Debtor agreed, with the universal
> understanding that the holder of title to the Property took title in name
> only, for the benefit of Durie, and that the titleholder was not to
> personally benefit in any way.

443 B.R. at 341-42.  Ann is said to be the owner of title insurance broker/agent East Coast; her

role as an individual borrower in a significant loan transaction which apparently was to include a

recordable mortgage (and involved her execution of a mortgage document for real property in

which she had no record interest), is questionable.  While not conclusive, the described conduct

by knowledgeable business people (Ann in her said capacity and Capazzi as an attorney-at-law)

certainly facially supported the trustee's suspicions as to rather fast and loose business conduct by these state court defendants. This property and its disposition through the bankruptcy court provide no foundation for any of the proposed future claims of the movants.

State Court Opinions. The state court issued a lengthy opinion of June 4, 2013; then, after the defendants moved for reconsideration issued its modifying opinion of August 1, 2013. The June 4 opinion detailed the "with prejudice" summary judgment complaint dismissal, but also dismissed the counterclaims "with prejudice." On reconsideration, the August 1 opinion revised the earlier opinion by ordering dismissal of the counterclaims "without prejudice."

The June 4 opinion is without efficacy, at least as to the counterclaims; yet, given the basis for reconsidering their "with prejudice" dismissal (discussed hereinafter) and certain commentary of the state court judge which was not contested by the reconsideration motion (or otherwise), that opinion is somewhat edifying as providing background. This court emphasizes that it has not lost sight of the "without prejudice" determination of August 1 and the due process basis for reconsideration of the earlier opinion.

At 6/4/13 Point "P," p.27, the court observed (as a never contested factual matter):

> Between the issuance of this Court's Order granting summary judgment and the issuance of this Opinion, Durie and Capazzi have submitted their Motion to Sever the Counterclaims from the instant litigation and Plaintiffs have submitted their Motion for Summary Judgment dismissing the Counterclaims against them. This Court finds that both Motions were not submitted timely and thus are mooted by this Opinion.

At Point "Q," p.29, the court made clear that relief from the § 362(a) automatic stay was never sought or obtained from the bankruptcy court, as follows:

> Day filed for bankruptcy protection on May 6, 2008. Defendants were

> aware of Day's bankruptcy filing even prior to the inception of this litigation in May 2009. Despite this awareness, Defendants have never filed a Motion with the bankruptcy court in order to obtain relief from the stay.[15]

This statement is thoroughly consistent with the bankruptcy court record.

The court went on to address the nonparty status of the debtor, Day (a point not seemingly ever contested, and a factual statement based upon the face of the ultimate pleadings):

> Because Day is not named as an individual third-party defendant in this lawsuit, these Counts cannot survive summary judgment.

This statement is consistent with the *trustee's* role in the state court pleading process and, more generally, per his Bankruptcy Code duties and authority. As should be apparent, Day's nonparty status in the state case is overarching as to state case *and* bankruptcy case issues.

Regarding the trustee's status and the *Barton* doctrine, the following never contested factual statement of 6/4/13 was made by the court:

> Wasserman was appointed as the Chapter 11 Trustee of Day's bankruptcy estate on January 5, 2009. Defendants have appeared numerous times before the bankruptcy Court in connection with Day's bankruptcy case. . . . At no point in the past three and a half years since the Trustee's appointment have Defendants sought leave of the Bankruptcy Court to pursue claims against the Trustee.

Point "R," p.30.[16] Again, this statement accurately reflects the bankruptcy court record.

---

[15] When revisited in the 8/1/13 opinion, there is an apparent conflation of bankruptcy concepts: the stay issue is somehow replaced with a discussion of the effect of failure to file a *proof of claim* by the defendants. *Id.* at pp. 3-4 (Point III(a)). Nevertheless, the case-jumbling effect of counterclaimants' leveling claims against *Day, a nonparty*, is clear.

[16] The court went on to make the following seemingly dispositive statements:

> While four years of discovery and motion practice has revealed that Plaintiffs' lawsuit against Defendants rested on little more than a business disagreement, Defendants have failed to submit any facts upon

As to Virginia Day, the 6/4/13 opinion determined the following:

> Because there are no allegations in the Counterclaim directed at
> Virginia Day to support a claim against her, summary judgment is
> hereby GRANTED in favor of Plaintiffs as to Ms. Day and all Counts
> in the Counterclaim against her are hereby dismissed.[17]

Point "S," p.36.

The state judge addressed the 335-39 Blaisdell Road property (which had already been

the subject of a bankruptcy court settlement with Ms. Mazzoccoli, based upon her husband's

business association with Day).  In reviewing the settlement, the following never contested

factual exposition in the 6/4/13 opinion was set forth:

> Through negotiations, a tentative settlement was reached with
> Mazzoccoli in May 2011 where the property would be transferred to
> her for $25,000.00 and other consideration.  The Trustee filed a
> Motion in the bankruptcy court seeking approval of the settlement.
> All parties were placed on notice of the proposed settlement and
> provided with an opportunity to object.  No one, including Defendants
> herein, objected.  The deadline passed, and the Order was entered
> approving the settlement on June 7, 2011.  Now, two years later,
> Defendants seek relief as to this property.
>
> Defendants are collaterally estopped from pursuing claims
> against Blaisdell.  Defendants were on notice as to the claims and
> disputes surrounding the title to Blaisdell.  Defendants were on notice
> that the Trustee proposed to transfer Blaisdell to Mazzocolli [sic] as
> part of a settlement.  Defendants could have filed an opposition.
> Defendants, instead, took no action against the transfer or disposition
> of Blaisdell.  To re-entertain claims regarding Blaisdell here would
> constitute a waste of the Court's resources.  Defendants had a full and

---

which a jury could find that Wasserman pursued the lawsuit in bad faith.

*Id.* at 31.  The effect of this conclusion appears to have been ultimately undermined by the August 1
opinion.

[17] This statement *was specifically disputed* in movant's reply brief on reconsideration which pinpointed
counterclaim count 9 ("Malicious Prosecution").  *See* dkt. 31-2 at Point VIII, p.12.  Though not addressed
in the August 1 opinion, this conclusion appears to have been nullified by it.

LETTER OPINION

fair opportunity to raise their claims against Blaisdell and failed to do so.

Point "T," p.32. The facts set forth here conform to the record in the bankruptcy court.

The Capazzi-Durie-CLM motion for reconsideration was essentially (though not exclusively) procedure-based in the sense that the counterclaims had been dismissed "with prejudice" but without a pending summary judgment motion by the plaintiffs nor opportunity for the movants to present their positions.[18] The with prejudice dismissal was contested on two overriding grounds: (i) *Barton* and automatic stay violations did not call for such a dismissal, *see*, supporting brief (dkt. 31) Point I, pp. 7-8; and, (ii) *sua sponte* dismissal of the counterclaims "on the merits," providing no notice and opportunity to be heard, *id.* at Point II, pp. 8-10. By way of reply brief (dkt. 31-2), argument was amplified, *and* a certain amount of additional argument on subjects not originally made in the motion was put forth: *see* Point II, pp. 2-6, regarding the failure of defendants to file a proof of claim; *see* Point V, p.8, relating to trustee negligence; and, *see* Point VIII, pp. 12-14, relating to Virginia Day, with emphasis on

---

[18] The movant's supporting brief on reconsideration (*see* dkt. 31) summarized the 6/4/13 "with prejudice" opinion as follows:

> (i) the court deemed Defendants' motion to sever the counterclaims and Plaintiffs motion for summary judgment as untimely and mooted by its decision and opinion; (ii) claims against Day, personally, were dismissed based upon the Court's finding that Defendants failed to obtain relief from the automatic stay; (iii) all claims against the Trustee were dismissed based upon the Court's finding that they violated the *Barton* Doctrine; (iv) all claims against Virginia Day were dismissed based upon the Court's finding that Defendants had failed to identify any actions taken by, or misrepresentations made by, Virginia Day, that caused Defendants harm; (v) claims related to the Blaisedell [sic] property were dismissed based upon collateral estoppel.

*Id.* at 5.

counterclaim count 9 ("Malicious Prosecution").

The motion for reconsideration was granted as indicated in the 8/1/13 opinion and implementing order. The order provided in pertinent part:

> ORDERED that the Motion of Defendants Louis A. Capazzi, Jr., Durie Properties, LLC, & CLM Management is hereby GRANTED, and the Order dated June 4, 2013 is hereby amended to reflect that Defendants' Counter Claims are dismissed "without prejudice" . . . .

The 8/1/13 opinion first referenced stay provisions of the Bankruptcy Code and failure of the defendants to file a proof of claim, and concluded that a "with prejudice" dismissal on these grounds was not warranted under the circumstances of the case. 8/1/13 opinion, Point IV(a), pp. 3-4. Dismissal without prejudice was deemed warranted. Similarly, the *Barton* doctrine reconsideration resulted in the amended dismissal ("without prejudice"). *Id*. at Point III(b), pp. 4-5. Ultimately, a due process basis for amendment of the 6/4/13 order and opinion was detailed. *Id.* at Point III(c), pp. 5-6.

In most pertinent part, the state court judge stated the following:

> *Upon reexamination of the pleadings, this Court finds that significant evidence exists upon which the Durie Defendants' Counterclaims may be grounded.* To refuse to allow the Durie Defendants to pursue their Counterclaims for damages arising out of this case would constitute a denial of due process.
>
> For the foregoing reasons, this Court finds that it may not dismiss the Durie Defendants' Counterclaims with prejudice absent providing opportunity to the Durie Defendants to litigate their claims.

*Id.* at Point III(c), p.6 (emphasis added). No *specific* finding was made, nor was any "significant evidence" identified upon which the counterclaims "may be grounded." These state court opinions thus provide no discernible foundation for the movants' future action.

The state court judge apparently retired at or around the time of the amended opinion and order.

N.J.C.R. 1:4-8[19] and N.J.S.A. 2A:15-59.1[20] Assertions.  The Capazzi-Durie-CLM claims for recompense per the applicable New Jersey frivolous pleading rule/statute, includes the

---

[19] N.J.C.R. 1:4-8 ("Frivolous Litigation"), provides in part:

> (a) Effect of Signing, Filing or Advocating a Paper. The signature of an attorney or pro se party constitutes a certificate that the signatory has read the pleading, written motion or other paper. By signing, filing or advocating a pleading, written motion, or other paper, an attorney or pro se party certifies that to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
> (1) the paper is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) the factual allegations have evidentiary support or, as to specifically identified allegations, they are either likely to have evidentiary support or they will be withdrawn or corrected if reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support; and
> (4) the denials of factual allegations are warranted on the evidence or, as to specifically identified denials, they are reasonably based on a lack of information or belief or they will be withdrawn or corrected if a reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support.

[20] N.J.S.A. 2A:15-59.1 ("Frivolous complaint, counterclaim, cross-claim or defense of nonprevailing party; award of costs and attorney fees to prevailing party"), provides in part:

> (1) A party who prevails in a civil action, either as plaintiff or defendant, against any other party may be awarded all reasonable litigation costs and reasonable attorney fees, if the judge finds at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the nonprevailing person was frivolous.

*certification* of the attorney for those parties, Timothy J. Dunn, II, Esq.  Among Dunn's

statements are the following (which capture much of the essence of the frivolous pleading

claims):

> 5.      Annexed hereto as exhibit A as the Certification of Louis A Capazzi Jr. dated December 28, 2012 describing the conduct of attorney Shaw in this litigation and describing Shaw's successful efforts to compel payment of $50,000 out of the closing proceeds of 11 Mountain View, a Durie property in the name of Ann Capazzi, in 2008.   This certification, submitted in support of Defendant's successful summary judgment motion, *describes how attorney Shaw, while concealing the fact that they Day [sic] had filed for bankruptcy and that he, and Shaw, had no authority to litigate or negotiate claims, nevertheless endeavored to seize control of Durie's sale activities.*   The writings of Shaw set forth in correspondence to Capazzi and attorney William Rush, Durie's attorney, *threatening Rush* and asserting authority that he did not have are annexed to co-counsel's Certification incorporated herein by reference.   This correspondence, as it pertains to 11 Mountain View, *amply demonstrates both the unlawful and improper violation of the automatic bankruptcy stay by Shaw and Day and the clear attempt by Shaw to exercise any legal authority which he did not have.* [Emphasis added.]

> 10.      *Upon information and belief*, the situation is aggravated by the fact that the Plaintiffs, and in particular, the Plaintiff's counsel, Shaw, have received significant financial benefit by virtue of this litigation, since, by application of these tactics, a settlement was obtained from Defendant William Rush, attorney for Durie Properties LLC.   *Upon information and belief, this settlement was used and applied to pay Shaw the entire amount thereof, or $200,000, by virtue of his representations to the Bankruptcy Court that such payment to him was required.*   These defendants assert that such settlement belonged, in fact, to Durie Properties LLC because Day could only have acted as a member of Durie to assert such claim on its behalf, Rush having been Durie's counsel.   Accordingly *the claim was derivative and Shaw and Day [sic] bound to pay such sum, and any other sums they obtained in settlement over to Durie.   Instead, Shaw, with the cooperation of his client, the Trustee, secured the full payment for himself on account of*

*legal fees..[sic]* [Emphasis added.][21]

These statements, already submitted to the state court (without stay relief) to promote the rule/statute position of the movants there, capsule recurring themes advocated in the state court motions (and expose the state applications' deficits). At Dunn ¶ 5, *somehow* frivolous pleading allegations are said to be bolstered by: (i) the purported effort by Shaw-Day in the March-June 2008 period to wrest control of Durie sales activities away from Rush-Capazzi (via threats of malpractice claims against Rush and Shaw's allegedly wrongful assertion of authority to so deal based on the May 8, 2008 Day petition filing); (ii) the implication that such activities were self-dealing contrary to the interest of the bankruptcy estate; (iii) in a misconstruing of the role of the § 362(a) automatic stay (flaunted by the defendant-movants for years) it is said to have been violated by the *debtor-in-possession*; and (iv) that limited liability company restrictions on disassociated former members impugns Day-Shaw activities in the March-June 2008 period (if not beyond). These allegations are undermined (in fact and/or law) by the following:[22]

(i) In fact, with the approval on 8/24/12 of this court Rush *settled* state case claims for a substantial sum ($160,000); the settled claims were based upon "numerous grounds including fraud, misrepresentation, legal malpractice and breach of fiduciary duty" (Notice of Settlement, dkt. No. 299); hence, any current claims by movants grounded in ill-treatment of

---

[21] Dunn would preserve "by reference" remnants of nearly six years of litigation and proceedings in the state courts and this bankruptcy case for purposes of proving frivolous litigation. *Id*. at 3.

[22] The *conclusion* that such allegations (even if they could be established) would necessarily support frivolous litigation sanctions is extremely tenuous at best. They are, with the benefit of hindsight, the angry remnant and now the would-be extension of "litigation . . . between two businessmen, Day and Capazzi," who "[w]hile [they] intended to operate Durie for a profit, the real estate crisis hit in 2007 and its prospects of yielding a profit quickly evaporated." 6/4/13 Opinion at p.2.

Rush are unsustainable (especially given this unobjected to and bankruptcy court approved

resolution of the trustee's claims in the state case); references to Shaw letters directed to Rush

and Capazzi in the March-June 2008 period regarding "11 Mountain View" provide no more

than some of the history of a matter settled for a substantial sum paid by Rush years later;[23] and,

Day's petition filing (including the "authority" argument), is essentially irrelevant to frivolous

pleading, as discussed immediately hereinafter (subpoints (ii)-(iv)).

(ii)    The transaction complained of (sale of "11 Mountain View") had been a

work-in-progress since at least March 2008,[24] well before Day's bankruptcy filing, thus

embodying alleged acts of Day which would be now subject to his bankruptcy discharge; the sale

was all but closed when Day filed his petition and by Capazzi's own statements reflect *his* rather

desperate need for the completion of the sale (*see* paragraph immediately below); moreover, the

much-cited Capazzi certification (Ex. A to Dunn certification, dkt. 2 to motion for sanctions in

state proceeding) harps on March 2008 events, in pertinent part as follows:

> 14.  In fact, In March 2008, while Durie was attempting to close on
> the sale of 11 Mountain View, Day, through his attorney, Charles
> Shaw, attempted to extort money from me and Durie by threating [sic]
> to sabotage the deal if we did not agree to pay Day $50,000 out of the
> proceeds from the closing.  *Specifically, Day had Shaw contact*
> *Durie's attorney, William Rush, directly and threaten Rush with*
> *attorney malpractice claims.*  He claimed that Rush was not
> "authorized" to conduct the closing and that Shaw would be "taking
> over" the closing and that if he did not cooperate with Shaw, he would

---

[23] More generally, and as should be obvious to all parties-in-interest, this substantial settlement and other case-related settlements and resolutions *in and of themselves* counter-assertions of the purported frivolous nature of the state case as undertaken by the trustee and serviced as special counsel by Shaw.

[24] *See* Exs. A and C to Dunn Cert., dkt 2, with emphasis on Ex. A, ¶¶ 14-21 and Ex. C, ¶¶ 12-15 and 18-25.

> suffer civil, ethical and criminal complaints.  Faced with the threat
> *that Day and Shaw would destroy the sale that both I and Durie relied*
> *upon to mitigate our losses, I acquiesced to Day's and Shaw's*
> *improper and meritless demands and agreed to pay Day $50,000 out*
> *of the closing proceeds.*  [Emphasis added.]

This purported basis for frivolous litigation sanctions is again rebutted by the actuality of Rush's

settlement, as well as by Capazzi – an attorney at law – acknowledging that "I acquiesced . . .

and agreed to pay."  In addition, the movants' emphasis on this transaction[25] –  stressing alleged

coercion, lack of authority, ill-reporting of its proceeds in the bankruptcy case – is driven by the

supposed documented/evidentiary import of Shaw's correspondence in the March-June 2008

period and *bankruptcy* disclosure issues relating to the $50,000 sale proceeds to Day.   The

correspondence is, as stated earlier, "evidence" of the Day-Shaw dispute surrounding Rush's

representation – a dispute *settled* by Rush; the "disclosure" issues, matters, if reflecting untoward

behavior, should have (but were not) brought to *this* court, are insubstantial, unsubstantiated and

speculative.[26]  In terms of the specifics of the sale, apparently the only contracted-for funds to be

---

[25] The Third Amended Complaint refers to 11 Mountain View in conjunction with other Day-Capazzi real
estate projects, and certainly without its emphasis as a special basis for liability; *see* Third Amended
Complaint ¶¶ 82, 84-88, 200(a)(17-19).  Yet movants turn that transaction into virtually their singular
"gotcha" point; this emphasis is apparently driven by a jaundiced view of the Shaw demand letters
("coercion," but later not so actionable as to prevent the $200,000 settlement), and events before *this*
*court* which are not, in this court's view substantial.

[26] Dunn, Ex. C (Capazzi Cert. Nov. ___ 2012, ¶ 25) exemplifies the tenor of the movants' accusations, as
follows:

> I have been given to understand that the Trustee in bankruptcy saw
> $40,000 of the Moutainview [sic] payment to Shaw disclosed on the
> Debtors Monthly Operating Report.  Very recently, in reviewing a
> transcript of bankruptcy proceedings I learned that Mr. Gavzy, Day's
> bankruptcy counsel, in answering for this $40,000 deposit in Bankruptcy
> Court, said that it was a return of a "loan from Capazzi," thus seriously
> misrepresenting the manner in which the money had, in fact, been
> obtained.   Eilsih [sic] McLoughlin sat silently while this false

derived from the closing or to account for post-closing claims of material men and suppliers, was

the $148,000 sale deposit amount which was escrowed with Rush (Ex. C ¶¶ 22-23); after the

closing (May 22, 2008, Ex. C ¶ 18) the funds were distributed by Rush.   Day received (albeit to

Capazzi's chagrin) the $50,000 he had demanded and various claims were resolved (some of

which said to have been with Capazzi funds); yet, it is conceded by Capazzi that some $40,000

was reported in the debtor-in-possession's monthly bankruptcy operating report (a clear

indication that Day was not operating for his "own" account, Ex. C, ¶25).   Similarly, the

Day-Shaw 11 Mountain View activities at the outset of the bankruptcy case, where much of the

transaction had been formulated prepetition, appears to have been a sale in the "ordinary course"

of the business of the debtor-in-possession (thus *not* requiring bankruptcy court approval, 11

U.S.C. § 363), and one in which Shaw's participation was ratified and sale particulars subject to

ultimate review and ratification by the trustee in both his appointed Chapter 11 roles.   As set

---

explanation, one that concealed Shaw's role, was given to the Bankruptcy
Court.  There was also no explanation at the hearing as to what happened
to $10,000 of the $50,000 actually paid, which I suspect was retained by
Shaw contrary to bankruptcy rules.

In fact, the bankruptcy court hearing referred to (Nov. 21, 2008) addresses at some length a $40,000
deposit reflected in the debtor-in-possession's account.  *See* dkt. 68.  Mr. Gavzy, counsel to the
debtor-in-possession, tentatively explained the deposit.  Tr. 11/18/08, 7:23-9:4.  The net of movants'
points – a "missing" $10,000 and characterization in 2008 of Day's funding of Day-Capazzi deals such
that the $40,000 was a loan repayment – are overstated by them.  Gavzy *variously* casts the amount as "a
payment . . . received from a former business colleague," "it would be loan repayment," "[t]his $40,000
represented an advance payment or repayment . . . of a loan."  Gavzy, tentative at best, was in no sense
committing debtor to a fixed position.  And, of course, Capazzi fails to say how the amount should be
accounted for: if not repayment of loan, return of capital?  "profit"? "fee for service"? "cash to seller"?
"per HUD-1 statement?"  None of this nomenclature had or would have had relevance to frivolous
pleading.  As to this accounting (and any missing $10,000), this transcript makes clear that the Office of
U.S. Trustee (and others) were well into review of Day's accounting, and fully capable of investigating
matters reported and unreported.  These "issues" were for the bankruptcy court and process, and were in
bankruptcy terms then and are now uncontroversial.  *Most telling, the trustee was appointed promptly
after this hearing (see orders of 12/23/08 and 1/5/09); he then displaced Gavzy and operated
independently in the administration of his duties.*

forth here and immediately below, the movants' rehashing of the 11 Mountain View transaction,

Day's demand for $50,000, and other related claimed infractions is, in this court's view,

overstated and not a proper foundation for a frivolous pleading claim.

(iii)  Movants: eschewed *for years* seeking any formal relief from the 11 U.S.C. § 362(a)

automatic stay to promote their counterclaims in the state case; failed to seek any distribution

from estate assets, having not filed any proof of claim; complained bitterly about Day's fraud but

never sought an exception to his discharge per 11 U.S.C. § 523(a); ran roughshod over the

*Barton* doctrine as it would require preapproval of state litigation against the trustee and others

(and ignored related immunity law); and, failed to object to appointments, settlements and

dispositions directly impacting the state case and motions of frivolous pleading.  Now, they

would perpetuate litigation, rather preposterously, in part by raising as a "sword" the automatic

stay said to have been violated *by a debtor-in-possession.*  To the contrary of movants' distortion

of the automatic stay, § 362(a) *does not* have application to any of the activities of Day (and

Shaw) on and after the petition date and in their capacities as debtor-in-possession and counsel

thereto.[27]

(iv)  Capazzi parties claim to be have been bamboozled by not being made aware of

Day's petition filing until sometime in July 2008; again, the effect of the claimed lack of notice

or knowledge of Day's May 2008 filing is said to have been on the 11 Mountain View

---

[27] Movants fail to identify with precision the subsection of § 362(a) which they assert and for good reason – no provision exists which would support their preposterous claim; rather, e.g., § 362(a)(3) enjoins "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," a provision roundly ignored if not violated by the principal state case defendant-counterclaimants over a period of years; *see* 6/4/13 opinion at Point "R," p.30 and 8/1/13 opinion at Point III(a), pp. 3-4.

transaction – a transaction reported upon and accounted for by the debtor-in-possession in this case and subject to review by the trustee upon his appointment and his ratification. The post-petition activities of Day-Shaw complained of were *not* outside the realm of authorized ordinary course functions of the debtor-in-possession. Movants' allusions here to lack of authority based upon their "derivative claim" (or related LLC statutory provisions) are incorrect as a matter of law (see in depth point detailed hereinafter), and, in particular run afoul of the creation of an estate (distinguish Day as an individual) in bankruptcy, *see* 11 U.S.C. § 541(a) and the duties and powers of trustees generally. Finally, the actual closing of 11 Mountain View was essentially established (and funded, in whole or part) prepetition, *a transaction which Capazzi wanted* (and said he needed). Again, "authority" issues would not have impaired the sale (including some post-closing disbursement issues, none of which has a plausible link to a claim against Day-Shaw-trustee for frivolous pleading), a*nd, to reiterate, this prepetition formulated near-complete transaction appears simply to have been concluded post-petition in the "ordinary course" (§ 363) of the business of the debtor-in-possession.*

Dunn at ¶ 10 blends the $200,000 Rush-Chicago Title settlement into a free-flowing swirl of: abuse of Rush by Shaw; a *continuatio*n of such abusive tactics to force the $200,000 settlement; Shaw's supposed misrepresentation to this court of his entitlement to the settlement proceeds as a fee; and Durie's entitlement to the settlement amount as the result of a "derivative" claim. None of these allegations has merit. Rush settled for $160,000, thus rebutting contentions of being abused by Shaw threats of legal malpractice claims and more. The $200,000 settlement was prompted by the mediation efforts of a retired Superior Court judge, hardly the background for prepetition abuse/coercion or for a continuum of abuse. *Movants*

*failed to object in this court to any aspect of the settlement.* Likewise, when this court was

conducting its settlement approval hearing, they made no claim (in this court or anywhere else)

that the unobjected to settlement was derivative or otherwise "belonged" to Durie. And, the

movants' now-repeated theme that *the bankruptcy court* was misled (if not subjected to

fraudulent representations) by Day-Shaw-Wasserman is put before the *state court* in a collateral

proceeding and as to the $200,000 settlement. Movants' complaint to another tribunal regarding

the $200,000 settlement approved here is *thoroughly wrong.* Efforts to argue that which was *not*

put before this court now as "fraud" on this court, or to ignore court determinations (such as the

approval of the $200,000 settlement), have upon this court's current review of the case record, *no*

*merit*.

      Dunn, on behalf of Capazzi-Durie-CLM, cross-refers to and incorporates frivolous

pleading assertions of Ann (made through counsel Jeffrey W. Varcadipane) (and apparently vice

versa). The volume of material submitted, redundancy in presentation and cross-references, all

would in their view make movants' diatribe *facially* sufficient to go forward with extended state

court action. But the allegations – as stated throughout this opinion – are without merit. Ann's

Rule 1:4-8 "Request for a Hearing" in the Superior Court, not marked by page numbers but

going on at great length through 115 paragraphs, tells and retells movants' story.[28] The saga of

11 Mountain View is retold at ¶¶ 19-36; in the retelling, no mention is made of Rush's

settlement, the $40,000 reported by Day is sloughed over in favor of emphasizing the "missing"

$10,000, nor is any mention made of the close attention paid to the Chapter 11 case and the

---

[28] The Request does seek to "mine" some other events including the bankruptcy of a Day security
company, Viking, and his troubles with IRS. *Id*. ¶¶ 11-18.

$40,000 deposit by the Office of the U.S. Trustee (and, more generally, later by trustee Wasserman).

The Varcadipane certification goes on to speculate about a Day-Shaw strategy to avoid case conversion to Chapter 7 via accusations against Capazzi – but, of course, case conversion (as noted) did, in fact, occur. *See* ¶¶ 38-42. Moreover, the *trustee*, appointed 1/5/09 in the Chapter 11 phase of this case, was the responsible fiduciary approving the 5/20/09 filing of the state case. *Most significantly*, this appointment (an option to the remedy moved for by the U.S. Trustee) evidenced *this court's* discounting of debtor's arguments for his continued control as a debtor-in-possession of estate affairs; those arguments thus became losing irrelevancies as of the decision to appoint a Chapter 11 trustee (12/23/08) (order of appointment 1/5/09) over a year before conversion (2/9/10).

The Varcadipane certification then catalogues Shaw's pre-case representation of Day (¶¶ 43-44), matters not in dispute in bankruptcy nor which would disqualify Shaw to act as "special counsel" per the Bankruptcy Code (§ 327(e)) to the debtor.

Missing from movants' compilations of years of the bankruptcy case docket materials is any foundation for their frivolous pleading motions in state court. They speculate, *finally* come to this court with their averments about fraud and manipulation here (but *not* for purposes of having this court deal with those matters of bankruptcy administration), and ignore all-too-telling settlements and dispositions here.

Ann's arguments continue via the Varcadipane certification (¶¶ 45-101) challenging the plaintiffs' state court pleadings on their face and emphasizing discovery results. Much of this is another at-length rehash; none of it forthrightly acknowledging the effect of partial settlements

and other dispositions.

Among (but not limited to) the unavailing/questionable aspects of this portion of the Varcadipane certification are:

¶ 45 – while acknowledging that the original complaint was filed post-petition and *after* the trustee was appointed, movant continues to characterize the pleading as one on behalf of Ralph Day "personally";

¶ 49 – editorializing as to Day-Shaw "refusing" to acknowledge Durie in the original complaint, a "calculated design in furtherance of a frivolous agenda," yet (i) this was the trustee's complaint, and (ii) one which when amended included Durie *as a party*;

¶ 52 – speculating (and acknowledged as such by its introduction by "[u]pon information and belief"), the *attorney's certification* opines without the slightest factual footing (or history in the record), as follows:

> Upon information and belief, the reason Plaintiff did not plead the claim in the more straight forward and honest manner, is because his claim would easily been converted to a dissolution before the chancery; but Plaintiffs had no interest in a dissolution, because they were fully aware that they were not actually owed money from Durie.

¶ 63 – continuing the erroneous implication, by reference to a caption correction in the Third Amended Complaint, that Ralph Day, personally, had been a party in the original complaint;

¶ 64 – The acknowledging that Durie's structure was pled in the amended complaint (without noting, however, the substantive effect such acknowledgement has on the rank speculations of the Varcadipane certification regarding lack of pleading emphasis on Durie by the trustee); *see also* ¶ 66 to the same effect;

¶ 67 – emphasizing purported misstatements to 666 Closter Dock Road and Durie's interest (but there is no mention of the trustee's adversary proceeding in which it was determined that the trustee had the real estate interest, while Ann's and Louis's business practices were questioned);

¶ 69 – demeaning and characterizing the complaint's targeting attorney Rush ("they [plaintiffs] assert claims directly against the attorney who conducted [Durie real estate] transactions *solely because their names were used in the transaction"* [emphasis added]); yet Rush settled with the trustee for $160,000, in ultimate terms justifying targeting Rush; no mention is made of this settlement by the certifying counsel;

¶ 72 – again, insisting on including Ralph Day as a purported party-plaintiff; he is wrong (a point noted in the 6/4/13 opinion, and one which simply misconceives the effect of Bankruptcy Code § 541(a) and the difference between the bankruptcy estate and the filing debtor);

¶¶ 73-88 – stressing "discovery" issues in an effort to disconnect Ann from her husband's business transactions; yet no mention is made of the 666 Closter Dock Road transaction in which Ann was *central*, nor the fact that she was/is an owner of defendant East Coast, nor that East Coast settled with the trustee, nor that in the course of settlement East Coast *released* the trustee, the bankruptcy estate, Day, and Virginia;

¶¶ 89-97 – emphasizing the relative inadequacy of the trustee's expert opinion and stressing an ultimate point that Capazzi's business loss far exceeded that of Day and as a result, the 6/4/13 opinion deemed "that Plaintiffs lacked *demonstrable* damages" (emphasis added) (¶ 103); yet plaintiffs' expert opined as to a $4,657,451 damage claim given his apparent large

business loss (6/4/13 opinion, p.5), though in the end Day's *loss* was not a basis for *damages* in light of Capazzi's greater loss.

The above review of Rule 1:4-8 frivolous pleading allegations, as augmented by this court's study of the bankruptcy case docket and matters overseen by it, establish that those allegations are basically *without merit*.  They do not establish a foundation for future state court action.

<u>Capazzi, Durie and Ann Proposed Complaint</u>.  These defendants (i.e., Capazzi, Durie, and Ann) would further perpetuate state and bankruptcy court litigation by filing a 70-page, 187-paragraph,[29] 19-count complaint (the "proposed complaint").   Debtor Day, his wife, Virginia, Shaw and his law office, and trustee Wasserman are the would-be named defendants. Much of the proposed complaint is a retread of the Rule 1:4-8 assertions; these assertions are subject to all of the rebuttal points set forth above.

Large portions of the tome-like proposed complaint implicate the debtor's alleged fraudulent and otherwise "bad" behavior prepetition.  *Yet the debtor has now been discharged of these and all other prepetition claims raised by any state case defendant.*[30]  Any efforts to collect such discharged debts would violate the statutory discharge injunction.   11 U.S.C. § 524(a).

The proposed complaint also revisits (improperly) Day-Shaw-related matters decided and

---

[29] Given the extent of the pleading's structure with many paragraphs having subparagraphs, the real number here is actually much greater.

[30] No defendant in the state case sought to except any 11 U.S.C. § 523(a)(2)(4) or (6) claim from  Day's discharge by filing the necessary adversary proceeding in bankruptcy.  *See* 11 U.S.C. § 523(c).  *See* later discussion herein regarding defendants' obvious actual knowledge of Day's bankruptcy filing (conceded to be as early as July 2008).

*put to rest* by the bankruptcy court, including (but not limited to) ¶ 86:

> Day, Shaw and the Shaw Firm made their false statements and representations, and secreted the information they were bound to reveal, with the express intent that the parties to whom they were made would rely upon the same and act upon them by paying monies to Day, and rescinding settlement agreements, reduce claims, pay damages, and/or enable Day and Shaw-Day to wrongfully pursue the same by the appointments of Shaw as special counsel in the bankruptcy action, and they did otherwise so act so as to defend against claims of fraud by Day in the Bankruptcy Court and in motions by the Trustee to convert the bankruptcy action to a Chapter 7, liquidation or for a dismissal of said bankruptcy.

This run-on amalgam of allegations was not properly and timely put before this bankruptcy court, and largely deals with matters approved after notice and hearing by this court. So too (and only by way of illustration) the bankruptcy court approved settlement regarding 335-39 Blaisdell Road and the 666 Closter Dock Road adjudicated as to ownership are raised as causes of action against all "Defendants." *See* Sixth Count, ¶ 113; Seventh Count, 117-120; and Eighth Count, ¶ 122.

The proposed complaint alleges civil RICO violations under New Jersey law against *all* defendants, notwithstanding the bankruptcy court's role in approving the appointment of special counsel and the trustee, the many appointment applications, the failed effort in bankruptcy to disqualify Shaw, *and the three bankruptcy court approved settlements directly affecting the state case. See* Thirteenth Count.

Perhaps most illustrative of the improper revisiting of matters previously put before the bankruptcy court or otherwise subject to required action *in this court*, is the Fifteenth Count, ¶ 159, which states the following:

> 159. Ancillary to the commencement of said suit by and service of

> process, Defendants, and each of them, engaged in the continuing
> course of conduct of misrepresenting in the United States Bankruptcy
> Court the interest of Durie Properties, LLC and Capazzi in and to
> properties of Durie located 666 Closter Dock Road, Closter, New
> Jersey and 337 Blaisdale, [sic] Orangetown, New York, by concealing
> the same, by asserting ownership of the same, by effecting a seizure
> and sale thereof by the Trustee in Bankruptcy free of the mortgage
> thereon which, by agreement of the parties, was the responsibility of
> Durie and by such other and further actions in the conduct of said
> litigation as to demonstrate an ulterior purpose for initiating suit
> against Plaintiffs in the prior action to the one for which such process
> was designed.

Such twisted portrayals (with "ultimate purposes" said to be somehow linked to the trustee's

initiation of the state case on 5/12/09) ignore *both* the trustee's duties in marshaling assets for the

estate and the clear estate benefit achieved as to these two properties.  Regarding 666 Closter

Dock Road, Capazzi and Ann's very questionable real estate practices (whether participated in

by Day or not) exposed the property to trustee Bankruptcy Code-based "strong arm" remedies

(*without* their active opposition to the trustee's ultimately successful summary judgment motion).

As to Blaisdell Road, movants remained silent as a complex multiparty settlement was developed

and then put before this court for hearing and approval.[31]  Movants simply misstate the effect,

value to the estate, and purpose of bankruptcy positive developments derived from the two cited

properties.

Again by way of illustration – but reflecting a constant theme throughout the proposed

complaint – is the effort to "unsettle" previously approved settlements.  The Seventeenth Count,

e.g., at ¶¶ 170-73, asserts the following:

---

[31] If the Varcadipane certified statement (¶ 159) is pressing a point that the trustee should have come to
the aid of, or deferred to questionable "Durie interests" (or even to accede to its only lately articulated
claims), that point is without merit; it totally misconstrues the role of the trustee.

170.  For the reasons set forth above, the claims asserted by Shaw-Day, on behalf of Day individually and/or his Trustee, as against Rush, East Coast Title, Ankit Duggal and others were, in fact, derivative claims under New Jersey's Limited Liability Act, which required that any proceeds recovered therefrom be turned over to Durie.  Accordingly, the claims asserted by Shaw and the Shaw Firm on behalf of Day and/or Wasserman belonged to Durie, not to Day, and were derivative claims which required the proceeds therein recovered to be turned over to Durie not retained by Day or his representative.

171.  Rush, through his insurance carrier opted to settle the claims as asserted against Rush by Day and/or his Trustee.  The settlement resulted in the receipt of $200,000 by the Trustee on account of the claims, which were in fact derivative claims belonging to Durie.  Pursuant to New Jersey's Limited Liability Act Durie was, and is, statutorily entitled to the proceeds recovered on account of Day's claims against Rush.

172.  *Upon information and belief, through various false representations by Shaw and Day and/or the Trustee on their behalf, the $200,000 settlement proceeds were applied to counsel fees to Shaw and the Shaw Firm.* [Emphasis added.] [Special attention must be given to this *groundless* accusation; *see also* Dunn ¶ 10 as applied to Rule 1:4-8 claims.  This very late accusation, made to a forum other than the bankruptcy court, is obviously designed to counter the significant rebuttal effect of the $200,000 settlement on movants' entire frivolous pleading construct.  To "spring" this point on a state court in hearings swelling with volumes of accusations is, like the accusation itself, improper.]

173.  The $200,000 proceeds, applied as fees to Shaw and the Shaw Firm, should be disgorged due to the aforementioned breach of fiduciary duties by Shaw and the Shaw Firm to Durie.

As will be discussed in a separate point below as to the related law, these movants have put forth an erroneous notion of Durie's rights under purported "derivative claims."  Moreover, in terms of context and as a factual matter, the trustee's claims were intended to benefit the estate, and were not challenged as being "derivative" until recently.  More specifically, they are *sub judice*

LETTER OPINION

"direct" claims and all proceeds therefrom are bankruptcy estate assets for factual/contextual

reasons including (but not limited to) the following:

> (i) The trustee is responsible for marshaling assets *for the estate*; the state case (and all related settlements and dispositions) were undertaken for that purpose (the antithesis of litigating in a derivative case for the benefit of the now defunct or near defunct "Durie" – i.e., essentially for its sole member Capazzi);

> (ii) With but one late exception (the $50,000 East Coast-Case settlement of 5/14/13), no "derivative" claim had ever been made to settlement and other disposition proceeds by any party-in-interest adverse to the trustee; moreover, no state case defense or counterclaim raised the "derivative" issue;

> (iii) Capazzi, as sole member of Durie, would be the *only* beneficiary of proceeds of "derivative" claims, a *direct* benefit to him and an absurd result given his position as the primary target of the state case;

> (iv) Ann or Louis Capazzi (or both) owned East Coast whose $50,000 settlement is now sought derivatively by Durie (i.e., Capazzi); again the result sought would be absurd, allowing East Coast to pay the trustee, release (as was done) the trustee, the bankruptcy estate, Day and his wife, and then claw back the payment;[32]

> (v) Regarding the Rush-Hackensack settlement, there is an inherent contradiction in "Durie's" claim to the $200,000 proceeds (a claim *only now* being made); movants argue continuously that Rush was victimized by Day-Shaw and that such "coercion" of counsel is a cornerstone of arguments for frivolous pleading; thus, this "by the way" reach for the proceeds of settlement, a settlement which has undercut *movants'* position of purported harm to Durie *not by Rush,* but by Day-Shaw, cannot be supported by any rational argument based upon Durie's derivative rights; the trustee's claim here was *direct* as a matter of context and fact; and

> (vi) *Direct* as well are the trustee's claims to the two parcels

---

[32] Movants appear to make broadly stated derivative claims, including claim to the $7,500 Duggal settlement (noticed 5/14/13 and approved without objection or claim by movants).

> of real estate (666 Closter Dock Road and Blaisdell Road) which
> came into the bankruptcy estate for administration by the trustee.

In ultimate structural terms, the proposed complaint "builds" on and thoroughly interconnects its claims. It does it in such a way as to essentially render inseparable hard to discern "other" claims (if there be any) from those *matters which cannot be pled or were or are matters for the bankruptcy court,* i.e., the claims discharged against the debtor, the Shaw-Wasserman appointment approvals by this court (and the overruling of an effort to disqualify Shaw), the bankruptcy court approval of the direct settlements *and* the two real estate related dispositions (666 Closter Dock Road and 335-39 Blaisdell Road), and a misconceived notion of purported derivative claims. It does the same by "lumping" essentially all claims against all would-be parties-defendant. As such, the pleading is defective and would, if allowed to go forward, be an affront to basic equitable/legal concepts and case developments before this court. Finality of litigation and closure of Chapter 7 cases are among the interests to be promoted at this late date in this bankruptcy-state case odyssey. *See e.g.,* 11 U.S.C. § 704(a)(1).

Matters Currently Before the Bankruptcy Court. This matter is now before this court on the verified complaint and order to show cause filed on September 24, 2013 on behalf of the trustee. The one count complaint seeks a permanent injunction against defendants Durie, CLM, Capazzi, (the "Durie defendants") and Ann from pursuing any and all claims against the trustee, special counsel to the trustee and the bankruptcy estate. The purported basis for the injunction is that those defendants violated the *Barton* doctrine (*Barton v. Barbour*, 104 U.S. 126 (1881)) by not seeking leave of the bankruptcy court regarding the filing of counterclaims in the state case, as well as the filing of recent motions for sanctions and legal fees pursuant to N.J.S. 1:4-8 and

N.J.S.A. 2A:15-59.1 (the Durie defendants and Ann having filed separate motions for both types of relief). Those motions were pending in state court when the trustee filed his complaint and order to show cause. The order to show cause sought neither interim nor preliminary relief but rather the trustee appeared to seek immediate entry of a permanent injunction pursuant to Fed. R. Civ. P. 65(a)(2) (incorporated into Fed. R. Bankr. P. 7065). On October 9, 2013 the Durie defendants and Ann filed a cross-motion: for leave under the *Barton* doctrine to pursue claims against the trustee and special counsel in state court (including both the above-referenced sanctions motions and a complex new pleading against Day, his wife Virginia, Shaw another law office, and trustee Wasserman); to vacate the stay with respect to the counterclaims previously pled in state court (which had dismissed the counterclaims now without prejudice); and, to enjoin distribution of the East Coast settlement proceeds, again arguing that they belong to Durie under the New Jersey Limited Liability Company Act, N.J.S.A. 42:2B-60. The bankruptcy court eventually held the hearing on the order to show cause on November 6, 2013 and reserved decision, having requested additional submissions before and after the hearing. By Stipulation and Order 1/30/14 all motions and matters before the court were to be deemed summary judgment motions, and the record was closed for decision.

This court has jurisdiction in this matter pursuant to 28 U.S.C. § 1334(b) and this District's Standing Orders of Reference of July 23, 1984 and September 18, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (G) and (O).

Implications *Sub Judice* of Automatic Bankruptcy Stay. As noted early herein (and often throughout), counterclaimants' pleading jumble (counterclaiming against a nonparty) in the state case has added substantially to chaos in that case, in the bankruptcy case, and on the current

motions.  In particular, there are, to one extent or another, ironic 11 U.S.C. § 362(a) implications.

A review of the eleven counts of the counterclaim plainly evidences that nine of them are firmly footed in *Day's* prepetition conduct.  These counts are *not* mere defenses to the complaint counts; rather they are quite independent, freestanding causes of action.  (Of course, as "counterclaims" they are at root defective since *Day was not a party-plaintiff in the state case*.)  The counts targeting Day, individually and for his prepetition conduct include (by way of *illustration*) the following:

Count 1 (Fraud)
¶ 1    ("Commencing in early 2004 . . . .")
¶ 4    (Listing Day's "promises and representations" to Capazzi in the formation of their business relationship.)
¶ 6    ("Said misrepresentations were materially false. . . .").

Count 2 (Claim for Wrongful Taking and Reimbursement)
¶ 4    ("By virtue of the wrongful takings of the plaintiff, Day. . . .")

Count 3 (Breach of Fiduciary Obligation)
¶ 3    ("By virtue of his wrongful takings and misrepresentations, plaintiff Day breached. . . .")

Count 4 (Breach of Duty of Fair Dealing)
¶ 3    ("By virtue of his wrongful takings and misrepresentations, as well as his failure to abide by his covenants to contribute and participate in the venture, Plaintiff Day breached. . . ."

Count 5 (Breach of Member's Statutory Obligation to Contribute and Share Losses)
¶ 2    (Citing Day's alleged breach of N.J.S.A. 42:2B-33, 34 and 35)

Count 6 (Breach of Venture Agreement)
¶ 2    ("Plaintiff, defendant on the counterclaim, Day, breached. . . .)

Count 7 (Conversion of Blaisdell Property)
¶ 2    ("On or about January 13, 2005, Durie . . . acquired . . . Blaisdell Road. . . ."

¶ 3      ("Defendant on the counterclaim, Day, has seized, converted and wrongfully taken said property. . . .") [*NOTE*: *This property, listed in Day's bankruptcy petition is the subject of further stay violation scrutiny as discussed below.*]

Count 8 (Constructive Trust)

¶ 2      ([C]ounterclaimants are entitled to a constructive trust upon . . . Blaisdell Road. . . .)  [*NOTE: As with Count 7, this Count, discussed further below, is to be scrutinized as a stay violation.*]

Count 10 (Specific Performance)

¶ 2      ("Capazzi seeks specific performance of the venture agreement. . . .").

*If* Day had been a party-plaintiff in the state case (as counterclaimants continually posit), the § 362(a)(1)[33] stay would have applied to each of these counts. However here, notwithstanding counterclaimants' intent, they are "saved"[34] from the formal effect of such violations by the deficiency of their own pleading (i.e., counterclaiming against a nonparty).[35]

There are, as indicated above, two exceptional counts which though not violative of § 362(a)(1) by dint of flawed pleading, are *clear and actual stay violations.* Counts 7 and 8 violate the § 362(a)(3) prohibition against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Blaisdell, property scheduled by the debtor, has been subject to the § 362(a)(3) violative acts by virtue of the conversion count *and* the demand for a constructive trust upon the property.

---

[33] The (a)(1) stay enjoins "commencement . . . of a judicial . . . action against the debtor that . . . could have been commenced . . . [prepetition] . . . or to recover a claim against the debtor that arose . . . [prepetition]. . . ."

[34] It is not inconceivable that, on close reading of (a)(1), all of the elements of stay violation are found in Counts 1-8 and 10; however, there is no need to prolong such discussion here. Penalties for violations are not being sought. *See* § 362(k). Counterclaimants' *intent* to take stay violation action is obvious, as are their failure to seek any "comfort order" from this court or to exhibit any concern for Bankruptcy Code compliance. And, other violations persist (i.e., Counts 7 and 8).

[35] Of course, since Day did not "plead" in the state case, any current effort per N.J.S.A. 2A:15-59.1 to have him account for frivolous pleading is a nullity.

Implications *Sub Judice* of the Bankruptcy Discharge of Ralph Day. Ralph Day was granted a bankruptcy discharge (unopposed) pursuant to 11 U.S.C. § 727 on December 4, 2013. That discharge applies to essentially all of the "ersatz" counterclaims that would be leveled against him, as well as the entirety of the proposed complaint.[36]

Day's failure to schedule the movants (each an obvious close affiliate of the other) does not nullify his discharge. Rather, Capazzi acknowledged that he had learned of the bankruptcy filing on July 15, 2008 during a state court hearing on the *Glen Rock Lumber* matter (a vendor's suit against Durie) (dkt. 2, Ex. D-1, Ex. A ¶ 19). The debtor did not schedule any of the defendants in the bankruptcy case filed on May 6, 2008 and never amended schedules to add any of them.

That July 15, 2008 "actual knowledge" date has amply satisfied (twice over) the *exceptions* to the exception to discharge of 11 U.S.C. § 523(a)(3).[37]

---

[36] To complete the picture on Day, since he was not a *party* to the state case he cannot be liable under N.J.S.A. 2A:15-59.1 for frivolous pleading. (And, as discussed further, any "accrual" issues thought to be "muddying the waters" on his purported malicious prosecution per the state court complaint are a detour – Day never "prosecuted" the complaint.)

[37]

      11 U.S.C. § 523. Exceptions to discharge.
A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
. . .

(3) neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

        (A) If such a debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing or;

Discharge per § 523(a) applies to "all debts that arose before the date of the order for relief" under Chapter 7 (§ 727(b)); *sub judice* that order relief "means the conversion" date from Chapter 11 to Chapter 7 (§ 348(b)).  In this case that date was February 9, 2010 (compared to the Chapter 11 filing date, May 6, 2008).

Section 523(a)(3) is structured to provide exception to discharge (and, knowledge-based exception to that exception), separating in (a)(3)(A) debt "not of a kind specified in paragraph (2), (4) or (6)" of § 523(a) – from (2), (4) or (6) exceptions ((a)(3)(B)).  Discharge of unscheduled debt is thus preserved/lost depending upon whether  "knowledge of the case" allowed for a timely filing of a proof of claim ((a)(3)(A)), or both a timely filed proof of claim and a "request for a determination of dischargeability" ((a)(3)(B)) under (2), (4) or (6) of § 523(a).[38]

*Sub judice,* no state case defendant (including counterclaimants and, in turn, movants) has filed either a proof of claim or an adversary proceeding complaint for a § 523(a), (2), (4) or (6) determination.

---

> (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and such request . . . .

11 U.S.C. § 523(a)(3)(B) (emphasis added).

[38] Many claims in the defendants' counterclaim or proposed state court complaint would constitute debts per § 523(a)(2) (fraud, false pretenses, actual fraud), (4) (fiduciary fraud or defalcation, embezzlement, larceny) or (6) (willful and malicious injury).  Note that § 523(c) requires this court to determine whether such debts are excepted from discharge.  Fed. R. Bankr. P. 4007(c) compels the creditor to file a complaint to determine the dischargeability of a debt under 11 U.S.C. § 523(c) no later than the date first set for the meeting of creditors unless the applicant moves for an extension before the expiration of that date.

While this case was still in Chapter 11, the Clerk's Office sent a *Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors & Deadlines* to the scheduled creditors. The notice established the then deadline for filing a complaint to object to the debtor's discharge or to determine the dischargeability of § 523(a)(2)(4) or (6) purported debt on August 4, 2008; the deadline for filing a proof of claim was September 2, 2008. After debtor's bankruptcy case was converted to Chapter 7 on February 9, 2010, the Clerk's Office sent a February 11, 2010 notice establishing the deadlines for filing a complaint to object to the debtor's discharge or to determine the dischargeability of a debt as May 11, 2010. The key dates *missed* by *Capazzi et al.* were nearly two years after Capazzi had gained actual knowledge of the case.[39]

To that extent that Dunn's counsel has raised separate argument about Day's purported malicious prosecution, and particularly its accrual, as stated at outset, the fact that Day was never a party to the state case is a complete rebuttal.[40]

---

[39] Even application of the Chapter 11 key dates would have nullified the § 523(a)(3) exception to discharge, justifying the knowledge-based exception to the exception per (a)(3)(A) and (B). *Inter alia,* courts place a significant burden on putative creditors with actual knowledge of a bankruptcy case to apprise themselves of relevant case deadlines in order to protect their claim. *In re Medaglia,* 52 F.3d 451, 455 (2d Cir. 1995). *See e.g., In re Compton,* 891 F.2d 1180 (5th Cir. 1990); *In re Alton,* 837 F.2d 457 (11th Cir. 1988); *In re Ricketts,* 80 B.R. 495 (B.A.P. 9th Cir. 1987); *In re Proskanzer,* 146 B.R. 125 (D.N.J. 1992).

[40] Counsel's 12/16/13 brief (p.15) cites *In re Wilson,* 116 F.3d 87 (3d Cir. 1997), holding that malicious prosecution claims against a debtor are § 523(a)(6) exemptions to discharge; however, counsel overstates this holding by implying that the § 523(a)(3)(B) exception time bar was not operative and that such a claim was never to be discharged. That is not the law. Further foray by counsel into *Matter of M. Frenville Co., Inc.*, 744 F.2d 332 (3d Cir. 1984) (no longer Third Circuit law as a general matter), and *In re Grossman's Inc.*, 607 F.3d 114 (3d Cir. 2010) coupled with *Wright v. Owens Corning,* 679 F.3d 101, 109 (3d Cir. 2012) as to accrual is also incorrect. *Wright,* a Chapter 11 transition case with Disclosure Statement and Plan provisions footed in *Frenville,* was a notice due process matter totally unrelated to the case at bar. *Sub judice* there is no need to exhaust an accrual analysis for a factually nonexistent act of prosecution by Day.

By operation of law (§ 524(a)(2)) all efforts to recover on any purported Day debt which has been discharged in this Chapter 7 case *is enjoined.*  The proposed complaint is most clearly improvident in its assertions against Day.

Implications *Sub Judice* of Assertions of "Derivative" Claim-Based Arguments of Movants.  The derivative claim thesis of movants (such that all trustee-developed proceeds from the state case are to be returned to or revert back to them through Durie) is inconsistent with law. Earlier in this opinion factual/contextual rebuttal to the characterization "derivative" was detailed.

Movants first press a point not at issue in the matter at bar: that the state case was, as a purported derivative action, not authorized per the applicable New Jersey statute, N.J.S.A. 42:2B-60 through 64.  Of course, given that the case claims were "direct," no such authorization was required and/or relevant).  Moreover, to reiterate the basic point, the *trustee* as the case plaintiff was never a "member" of Durie, LLC, nor claimed rights as such.

*In re Sharkey,* 272 B.R. 574, 581-82 (Bankr. D.N.J. 2001) capsules the law applicable to the derivative-direct action distinction for the closely analogous context of closely held corporations (not LLCs).

> The difference between a "derivative" action by a shareholder on behalf of the corporation, and a "direct" action by a shareholder on her own behalf is best stated in § 7.01 of The American Law Institute's Principles of Corporate Governance: Analysis and Recommendations, which states in relevant part:
>
>> (a)      A derivative action may be brought in the name or right of a corporation by a holder ... to redress an injury sustained by, or enforce a duty owed to, a corporation. An action in which the holder can prevail only by showing an injury of breach of duty to the corporation should be

treated as a derivative action.

> (b)      A direct action may be brought in the name and right of a holder to redress an injury sustained by, or enforce a duty owed to, the holder. An action in which the holder can prevail without showing an injury or breach of duty to the corporation should be treated as a direct action that may be maintained by the holder in an individual capacity.

*See Brown v. Brown,* 323 N.J. Super. 30, 36, 731 A.2d 1212 (App. Div.), *certif. denied,* 162 N.J. 199, 743 A.2d 851 (1999).

In *Strasenburgh,* the New Jersey Supreme Court offers this example of conduct that gives rise to both types of actions:

> The example is of directors making a worthless investment in untested technology while touting the optimistic potential of the technology. Investors deceived by the recklessly optimistic statements that occasioned shareholders to buy or retain their shares may sue for the direct injuries that they suffered. Shareholders may also sue for the derivative injury to the corporation for the imprudent and wasteful investment in faulty technology. The distinction between the two types of action is crucial.

146 N.J. at 549, 683 A.2d 818. "Concededly, a thin line often separates actions that are derivative or individual." *Id.* at 552, 683 A.2d 818.

Applying these precepts *sub judice,* given the earlier detailed factual/contextual basis for the trustee's direct action, amply rebuts movants' derivative claim argument. *See,* most recently, *In re Pervis*, 497 B.R. 612, 623-25 (N.D. Ga. 2013). In sum (and from outset) the Capazzi-Day dispute was a two-party matter between business associates; involvement of the LLC entity did not affect the character of the *direct* claims at issue between them.

Implications *Sub Judice* of the *Barton* Doctrine and Quasi-Judicial Immunity.  *In re VistaCare Group, LLC*, 678 F.3d 218 (3rd Cir. 2012) clearly confirms that the *Barton* doctrine is established law in this circuit.

> The first question presented by this case is whether a party must first obtain leave of the bankruptcy court before it brings an action in another forum against a bankruptcy trustee for acts done in the trustee's official capacity. We now join our sister circuits in holding that, under the doctrine established in *Barton v. Barbour,* leave of the bankruptcy court is required before instituting such an action.

*Id*. at 224 (omitting supporting citations in many circuits).  The court went on to grant substantial discretion to the bankruptcy court in assessing the state case sought to be pursued against the trustee (applying a "not without foundation" standard).   "It is within the discretion of the bankruptcy court to determine that such questions are most appropriately answered by a state tribunal."  *Id*. at 234.

In *VistaCare* the bankruptcy court in its discretion and as permitted only chose to make the most minimal inquiry into the state court issues, felt satisfied as to the "not without foundation" standard, and granted the *Barton* leave; the Court of Appeals affirmed.  *Id.* at 234-35.  The case at bar is quite different.  Here, this court has been involved with various aspects of the state case, *an ongoing litigation for which no leave was sought as to counterclaims.*  In addition, *Barton* leave is now sought for frivolous pleading sanctions against the trustee and counsel, and to name them in a proposed complaint, all of which either arises from or is reflected in the precursor state case.  This bankruptcy court, having approved appointments of trustee and counsel, as well as important related settlements, and having made certain related dispositions, cannot ignore the bankruptcy case record and permit *unfounded*

claims to go forward in state court against the trustee and counsel. Therefore, this court has exercised its discretion differently from the *VistaCare* judge. That bankruptcy judge decided a matter dealing with state law (restrictive covenant issues); *sub judice* the events of a long-pending bankruptcy case are bound up in the *Barton* analysis.

The *Barton* doctrine requires a party-in-interest to seek stay relief from the bankruptcy court in order to sue a bankruptcy trustee in another forum. *Barton v. Barbour*, 104 U.S. 126, 128-29 (1881) (a railroad receiver appointed by a Virginia state court was sued for personal injury in a District of Columbia court. The Supreme Court deemed that allowing the suit was a mere precursor to judgment and to execution upon trust property thereby undermining the authority of the original court over the trust. The Court implied that such a suit initiated without leave should be void *ab initio* and could not be cured by an injunction or a finding of contempt. *Id.* at 128. The dissent in *Barton* would have allowed the suit because the receiver was operating the railroad; that dissent became the basis for the business exception discussed below).

The *Barton* doctrine has been applied to bankruptcy trustees (1) as a requirement implied in 28 U.S.C. § 959(a), (2) as a matter of federal common law pursuant to an "unbroken line of cases" from 1891 and (3) as the bankruptcy trustee is a "statutory successor to the equity receiver." *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998) (Posner, J.) (affirming the decision of the bankruptcy court and the district court to deny a plaintiff's motion for leave to sue a Chapter 7 trustee for malicious prosecution eleven months after the bankruptcy case was closed). In *In re Linton* Judge Posner provided an extensive rationale for extending *Barton* protection to the trustee post-administration (including that, if aggrieved parties "could sue the trustee in state court for damages arising out of the conduct of the [bankruptcy] proceeding, that court would

have the practical power to turn bankruptcy losers into bankruptcy winners, and vice versa. . . ”).

The denial of a motion for leave to sue the bankruptcy trustee in another forum is reviewed for

abuse of discretion. *In re Linton*, 136 F.3d at 546.

The bankruptcy court must first determine whether the *Barton* doctrine applies to the

conduct alleged against the trustee, or whether one of two exceptions takes the matter outside

*Barton* protection. The first exception is the *business exception*, based on the dissent in *Barton*

*v. Barbour*, 104 U.S. 126, 137 (1881), now codified in 28 U.S.C. § 959(a), which does not afford

*Barton* protection to the trustee who is operating the debtor. 28 U.S.C. § 959(a) states:

> 28 U.S.C. § 959. Trustees and receivers suable; management; State laws.
>
> (a) Trustees, receivers or managers of any property including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

“Operation of the debtor” is simply and narrowly construed and

> is intended to permit actions redressing torts committed in furtherance of the debtor’s business, such as the common situation of a negligence claim in a slip and fall case where a bankruptcy trustee, for example, conducted a retail store.

*In re Lehal Realty Assoc*., 101 F.3d 272, 276 (2d Cir. 1996). *Muratore v. Darr*, 375 F.3d 140,

144-45 (1st Cir. 2004). *Sub judice* the business exception to *Barton* is inapplicable; the trustee

did not “operate” the debtor’s business (which has been essentially defunct).

The second exception is the *ultra vires exception. Barton* protection is not afforded to the

trustee who acts outside the scope of the trustee’s official duties. Courts recognize a

"presumption in favor of the trustee, counsel, or other bankruptcy official" that that appointed

person is acting within the scope of official duty. *In re Lowenbraun*, 453 F.3d 314, 322 (6th Cir.

2006) (a trustee who sued debtor and debtor's former spouse for turnover and accounting of

significant funds which had already passed into debtor's control and been squandered by the

debtor was not acting *ultra vires* and was therefore subject to *Barton* protection); *see also In re*

*Triple S. Restaurants, Inc.*, 519 F.3d 575, 578-79 (6th Cir. 2008). There is nothing in the matter

at bar to indicate that the trustee was operating outside the bounds of his normal duties (i.e., to

marshal assets for the estate via litigation in a dispute originating as one between business

affiliates).

      The matter at bar thus calls for *Barton* doctrine application. After the bankruptcy court

determines that the *Barton* doctrine applies (as here), the bankruptcy court grants stay relief only

if the movant makes a *prima facie* case against the trustee. *In re VistaCare Group, LLC*, 678

F.3d 218, 232 (3d Cir. 2012); *Nat'l Molding Co.*, 230 F.2d 70, 71 (3d Cir. 1956); *In re Kashani*,

190 B.R. 875, 885 (B.A.P. 9th Cir. 1995) ("The court granting leave to sue in another forum

must be able to evaluate the claims that are being asserted against the trustee in order to make its

independent determination of whether to grant leave to sue." That independent determination

will require the movant to submit a detailed motion or a copy of the proposed complaint against

the trustee).[41]

---

[41] *In re Ridley Owens*, 391 B.R. 867 (Bankr. N.D. Fla. 2008), not the law of this circuit, is factually very different from the matter at bar. The continued involvement of *this court* before, during and now after the state case makes it clear that bankruptcy issues were a constant. Settlements and other dispositions here were significant and *most notably form the basis for much of movants' proposed future actions against the trustee and others*. Moreover, the August 2013 state court opinion recognizes *Barton's* applicability and impliedly commends that, if any further action by the movants is to be taken, *Barton* relief be sought

The more general immunity than *Barton* (quasi-judicial immunity, derived quasi-judicial immunity) also attaches to the trustee and its officers in the discharge of their duties. "[J]udicial immunity not only protects judges against suit for acts done within their jurisdiction, but also spreads outward to shield related public servants, including sheriffs, police officers, clerks of court, referees and trustees in bankruptcy, and receivers appointed to conserve assets." *Wickstrom v. Ebert*, 585 F. Supp. 924, 934 (D. Wisc. 1984). "The trustee or receiver derives his immunity from the judge who appointed him." *Mullis v. U.S. Bankr. Ct. for D. Nev.*, 828 F.2d 1385, 1390 (9th Cir. 1987). The court in *In re Kashani,* 190 B.R. 875, 883 (B.A.P. 9th Cir. 1995) recited a litany of judicial immunity and demonstrated the relationship among *Barton*, 28 U.S.C. § 959(a), and quasi-judicial immunity:

> It has long been established that a bankruptcy trustee is an officer of the appointing court. As an officer of the court, the trustee is entitled to a form of derivative judicial immunity from liability for actions carried out within the scope of the trustee's official duties. *Bennett v. Williams*, 892 F.2d 822, 823 (9th Cir. 1989) . . . . A trustee is entitled to such immunity only if the trustee is acting within the scope of authority conferred upon the trustee by the appropriate statute(s) or the court . . . . While a trustee is allowed to make reasonable mistakes where discretion is allowed, a trustee may be sued for *intentional or negligent actions* which amount to violations of the duties imposed upon the trustee by law. *Bennett*, 892 F.2d at 823; *Hall v. Perry* (*In re Cochise College Park, Inc.*), 703 F.2d 1339, 1357 (9th Cir. 1983) [citing *Mosser v. Darrow*, 341 U.S. 267, 272-74 (1951)].
>
> . . .
>
> Courts have long held that the nonappointing court may not entertain suits against the trustee for acts done in the trustee's

---

in the bankruptcy court ("permission pursuant to *Barton* to pursue Counterclaims is an inquiry solely within the Bankruptcy Court's jurisdiction and discretion." 8/1/13 at p.4). The court then opines as to the *Barton* relief conclusion, a gratuitous opinion which is respectfully disagreed with *sub judice.*

> official capacity without leave from the appointing court because
> the other court lacks subject matter jurisdiction [citing
> *Barton*] . . . .

*In re Kashani*, 190 B.R. at 884 (other internal citations omitted) (emphasis added) (concluding

that breach of fiduciary duty alleged by plaintiffs against the Chapter 11 trustee did not come

under the 28 U.S.C. § 959(a) exception and that the complainants were required to seek stay

relief before suing the trustee in another forum).  In *In re Harris*, 590 F.3d 730, 736 (9th Cir.

2009) the debtor, without seeking leave of the bankruptcy court, sued the Chapter 7 trustee, her

two counsel and a creditor-assignee in state court alleging that they sold property in breach of a

settlement agreement and that they inflated claims in order to reduce the debtor's recovery.

Although the court of appeals ruled that removal of the debtor's complaint to federal court cured

the *Barton* violation (a position disputed by other courts), the court of appeals nonetheless

dismissed the debtor's complaint on the alternate ground that the defendants (Chapter 7 trustee,

her two counsel and the creditor-assignee) were all subject to "derived quasi-judicial immunity":

> "Bankruptcy trustees are entitled to broad immunity from suit
> when acting within the scope of their authority and pursuant to
> court order." *Bennett v. Williams*, 892 F.2d 822, 823 (9th Cir.
> 1989).  Additionally "court appointed officers who represent the
> estate are the functional equivalent of a trustee."  *Crown Vantage*,
> 421 F.3d at 973.  The doctrine of judicial immunity also applies to
> court approved attorneys for the trustee.  *Smallwood v. United
> States*, 358 F. Supp. 398, 404 (E.D. Mo. 1973), *aff'd mem.,* 486
> F.2d 1407 (8th Cir. 1973).

*Id.* at 742.  The 9th Circuit in *In re Harris* derived from *Bennett v. Williams* (which in turn

derived from *Mosser v. Darrow*, 341 U.S. 267, 274 (1951) four factors which trustees must

satisfy to invoke quasi-judicial immunity:

> (1) their acts were within the scope of their authority;

(2) the debtor had notice of their proposed acts;
(3) they candidly disclosed their proposed acts to the bankruptcy court; and
(4) the bankruptcy court approved their acts.

*In re Harris*, 590 F.3d at 742.  The court in *In re Summit Metals, Inc.,* 477 B.R. 484, 501 (Bankr.

D. Del. 2012) opines (as other courts do not) that derived quasi-judicial immunity is a *defense*

which trustee may invoke when it meets the four factors.[42]   *Sub judice* these four factors have

been satisfied; whether by defense or otherwise this immunity applies.

Quasi-judicial immunity extends to the trustee's attorney under the same analysis of

covered activities.[43]   *See In re DeLorean Motor Co.*, 991 F.2 1236, 1241 (6th Cir. 1993).

There is authority for the proposition that a *Barton* violation, presumably amplified by

ignoring the related immunity, cannot be cured by removal or by obtaining leave after the fact

but must be dismissed for lack of subject matter jurisdiction.  *See also Carter v. Rodgers*, 220

F.3d 1249, 1254-55 (11th Cir. 2000) (absent leave obtained in advance the district court lacked

subject matter jurisdiction to hear a complaint for breach of fiduciary duty against the trustee in

the exercise of his administrative duties and properly dismissed the complaint).  The court in *In

re Summit Metals, Inc.,* 477 B.R. 484, 497 (Bankr. D. Del. 2012) observed that there is no

controlling Third Circuit authority on whether a *Barton* violation may be cured or whether the

filed matter is void *ab initio.* The court in *In re Summit Metals* held that there could be no

---

[42] *Mosser* and *In re Mailman*, 196 F.3d 1 (1st Cir. 1999) invoked immunity in the context of actual orders. The trustee in *Mosser* was admonished after the fact that he should have sought instruction from the court before instituting a questionable administrative procedure (341 U.S. at 274); and the trustee in *In re Mailman* sought immunity under an existing order which allowed him to abandon a potential cause of action (196 F.3d at 8).

[43] There is no basis for denying *Barton*/immunity protections here because Virginia was included as a nominal party accommodating the trustee and the estate; this court approved Shaw's representation of Virginia under the circumstances of this case.

retroactive cure, and having before it the "errant" complaint following removal and remand, dismissed the complaint on the defendants' Fed. R. Civ. P. 12(b)(6) motion. *Id*. at 497-98. In the case at bar, the *Barton*/immunity violations – including absence of a foundation to go forward – *cannot be cured*.

Applying *VistaCare* to the matter at bar, the Third Circuit provided a broad grant of discretion to this court. The fact that the bankruptcy court was not *required* to make in-depth analysis of the movants' proposed actions, certainly is no *bar* to that analysis where circumstances dictate. The intertwining of bankruptcy issues and state case issues is an overriding factor in this dispute. It calls for decision-making here at least through the *Barton* stage and through comprehensive resolution of all pending motions, rather than presentation to an uninitiated court.

To be clear, the lack of foundation for movants to continue litigation requires this reviewing court to *bar* any future actions for purported "frivolous" or "malicious" acts by the trustee as well as *bar* same against Shaw. *Barton* and immunity also protect the trustee and Shaw from *all* proposed future claims. *See generally Summit Metals, Inc.*, cited throughout. (*See* point below as to Virginia Day.)

Hence, immunities and *Barton* relief review, including a *deeper analysis of "foundation" of would-be* future claims has been undertaken here and now.[44] This court has found that the N.J. Rule and Statute frivolous pleading claims, as well as those of the proposed complaint, are often glaringly

---

[44] Movants rely on *In re Sturm*, 121 B.R. 443 (Bankr. E.D. Pa. 1990) as restricting bankruptcy court authority/discretion to make such analysis. This older trial court opinion is not cited as authority in *VistaCare* and at its core is inconsistent with the Third Circuit's grant of discretion to bankruptcy courts.

inaccurate, include misstatements of the bankruptcy record, and are overstated and redundant, all of same being inconsistent with the foundation necessary to obtain *Barton* and related relief.

    <u>Status of Virginia Day in this Bankruptcy Case</u>.  Virginia Day was simply accommodating the trustee when named as a plaintiff in the state case.  She was thought to be a necessary party for pleading purposes; Virginia disclaimed any financial interest in the case's outcome.  Her direct formal connection to the bankruptcy case was through Shaw's application for retention through which the estate authorized *Shaw* to represent *both* the trustee and Virginia.  *See "State Court Opinions," supra,* for effect of state court dismissal of malicious prosecution count.

    Significantly, Virginia's actions pre and post-petition have been fully vetted as part of this court's analysis of allegations of frivolous pleading and the substance of the proposed complaint.  (It should be clear there was no "pleading," frivolous or otherwise, prepetition.)  The *absence of foundation* as to other claim targets (i.e., the trustee and Shaw) should, *a fortiori*, be applicable to Virginia (a thoroughly passive and accommodating party without a monetary interest in the state case).  As a minimum, *collateral estoppel* should apply to bar any further action against Virginia.

    Notwithstanding the foregoing, *Virginia has not sought relief in this court*.  It must be assumed that for relief purposes she has not asked this court to invoke its jurisdiction.  (Whether such jurisdiction would be available, by common law or through concepts of pendant or ancillary jurisdiction is thus beyond the scope of this Opinion.)  This is a fundamental jurisdictional gap yet, this court would be remiss if it did not stress this point (without granting any relief).  Indeed, Varcadipane briefs, while well preserving jurisdictional arguments, has also argued the substance of claims against Virginia.  *See* brief of 10/9/13 (adv. dkt. 9); *see also* briefs of 11/1/13 and 12/16/13 (adv. dkt. 27-4, 35-4).

Injunctive Relief.  This court has authority under 11 U.S.C. § 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a) also provides that the court is not precluded *sua sponte* from "taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."  *See also U.S. v. Energy Resources Co.,* 495 U.S. 545, 549 (1990).  In the instant case the course of litigation pursued and sought to be pursued by the defendant-movants in state court has been fully described throughout this opinion.  Defendant-movants would violate the stay and discharge injunction, subvert existing court orders for marshaling and distribution of estate assets, purport to argue as original issues matters previously decided by the bankruptcy court and interfere with the trustee's administration of the estate (among other described conduct).  This course of conduct warrants the bankruptcy court's invocation of appropriate injunctions pursuant to 11 U.S.C. § 105(a).

Conclusions and Findings.  This court has rendered conclusions and findings throughout this opinion summarized, most cryptically, below.

Ralph Day cannot be pursued for frivolous pleading in the state court for the most obvious reason:  he was never a party to the state court case.  In addition, and quite independently, there is absolutely no foundation for continuing litigation or initiating litigation against him by way of the proposed complaint or otherwise.  And again as an independent basis for bar, Day has been discharged in bankruptcy and garners the full benefit of that discharge.

The trustee and special counsel Shaw (including his law firm in every iteration throughout the six years) are fully protected from all frivolous pleading claims in the proposed complaint by both the *Barton* doctrine and applicable immunities.  Specifically, this court finds

that there is no foundation for going forward against the trustee and Shaw *et al.*

The trustee's settlements and other related dispositions throughout this bankruptcy case are and have been a function of his direct claims; those claims are not and should not be considered as derivative for the benefit of any other party except the bankruptcy estate.

Since Virginia Day has not sought *relief* in this court (for whatever reason) none shall be provided. However, issues of foundation to go forward against her for frivolous pleading or per the proposed complaint have been fully vetted by this court as they would apply to other related parties. The concept of collateral estoppel as it would apply to any future action against her *is* obvious.

Very truly yours,

Morris Stern
United States Bankruptcy Judge

MS/pc

## TABLE OF CONTENTS

Page

Bankruptcy Court Appointment Approvals (Trustee, Counsel and Special Counsel)....................5

Settlements with State Court Case Defendants.................................................................................9

Blaisdell Road Settlement..........................................................................................................11

*Wasserman v. Capazzi*, 443 B.R. 338 (Bankr. N.J. 2011) ...........................................................12

State Court Opinions..................................................................................................................13

N.J.C.R. 1:4-8 and N.J.S.A. 2A:15-59.1 Assertions...................................................................18

Capazzi, Durie and Ann Proposed Complaint ............................................................................30

Matters Currently Before the Bankruptcy Court ......................................................................35

Implications *Sub Judice* of Automatic Bankruptcy Stay .............................................................36

Implications *Sub Judice* of the Bankruptcy Discharge of Ralph Day ..........................................39

Implications *Sub Judice* of Assertions of "Derivative" Claim-Based Arguments of Movants .....42

Implications *Sub Judice* of the *Barton* Doctrine and Quasi-Judicial Immunity ...........................44

Status of Virginia Day in this Bankruptcy Case ........................................................................52

Injunctive Relief........................................................................................................................53

Conclusions and Findings ..........................................................................................................53